FILED

11/22/2024

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Knoxville July 23, 2024

## STATE OF TENNESSEE v. ANTONIO M. STARNES

**Appeal from the Circuit Court for Rutherford County**
**No. 81624    James A. Turner, Judge**

_____

### No. M2023-00958-CCA-R3-CD
_____

A Rutherford County jury found Defendant, Antonio M. Starnes, guilty of first degree premeditated murder and possession of a firearm by a convicted violent felon. The trial court imposed an effective sentence of life plus seventeen years and six months. On appeal, Defendant contends: (1) the evidence was insufficient to support the convictions; (2) the trial court erred in issuing a flight instruction; and (3) the trial court failed to properly poll the jury. We remand for entry of judgments reflecting the trial court's dismissal of Counts 2, 4, 5, and 6. We otherwise affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed; Case Remanded**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which TIMOTHY L. EASTER and TOM GREENHOLTZ, JJ., joined.

Taylor D. Payne (on appeal), and Rusty Perkins, Drew Perkins, and Michael Jones (at trial), Murfreesboro, Tennessee, for the appellant, Antonio M. Starnes.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Jennings H. Jones, District Attorney General; and Matthew Westmoreland and Eric Farmer, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

#### I.  Facts and Procedural History

Defendant's convictions resulted from his shooting the victim, Byrus Hughes, multiple times in Murfreesboro, Tennessee, during the early morning hours of May 3, 2018.

The victim survived for several months but succumbed to his injuries on November 2, 2018. Following the shooting, Defendant fled the scene and went to a motel and then to Nashville. On May 8, 2018, after Defendant returned to Murfreesboro, officers with the Murfreesboro Police Department ("MPD") attempted to stop Defendant's vehicle, but Defendant fled from the officers at a high rate of speed and crashed into another vehicle, which had a woman and her child inside.

Defendant was indicted for first degree premeditated murder, employment of a firearm during the commission of a dangerous felony, possession of a firearm by a convicted violent felon, evading arrest, reckless endangerment, and employment of a firearm during the commission of a dangerous felony after having previously been convicted of a dangerous felony.[1] Prior to trial, the trial court severed the counts of evading arrest and reckless endangerment from the remaining counts. In April 2021, a bifurcated trial was held on the charges of first degree premeditated murder and possession of a firearm by a convicted violent felon.[2]

According to the evidence presented at trial, shortly before 5:00 a.m. on May 3, 2018, the victim was shot numerous times while in the middle of South University Street near the intersection of Reid Avenue. Prior to the shooting, Defendant, Marcus Johnson, Jessica Thomas, Jennifer Dempsey, and Travis Johnson[3] went to Reid Avenue to purchase crack cocaine. Defendant drove the group to the area in a dark-colored sedan with a white mirror on the driver's side and parked his vehicle across the street from the house where they planned to purchase the drugs. Marcus testified that he had forty dollars in cash, that he gave twenty dollars to Defendant, and that they planned to see which of them could purchase the most drugs with their money. Defendant and Marcus entered the house while the rest of the group remained inside Defendant's vehicle.

Marcus testified that he and Defendant each spoke to a different drug dealer, and the dealer to whom Marcus spoke instructed him to tell the others in the vehicle to leave and return later. Marcus went outside, and Defendant exited the house shortly thereafter. Marcus stated that Defendant told everyone that they needed to leave because he had something that he needed to do. Marcus and Defendant compared the amount of drugs that they were each able to purchase, and because Defendant purchased more drugs, he gave some of the drugs to Marcus. Defendant reentered the house, while the rest of the group

---

[1] The appellate record includes the superseding indictment but does not include the original indictment.

[2] The record does not reflect the reason the parties did not proceed to trial on the remaining firearm charges.

[3] Because Marcus Johnson and Travis Johnson have the same surname, for clarity, we will refer to them by their first names.

walked through a "cut" that led to a yard owned by Joe Roberts. Once Marcus, Travis, Ms. Thomas, and Ms. Dempsey reached Mr. Roberts's backyard, they smoked the crack cocaine that Marcus had purchased. Marcus stated that before leaving Reid Avenue, he saw Darnell Mayer, also known as "Deuce," ride a bicycle down the street and in the same direction in which Defendant had gone. Mr. Mayer testified that after he rode his bicycle past Defendant and others standing outside a vehicle, he stopped and talked to some people who lived in the area and that he "hit a blunt about twice."[4]

Marcus, Mr. Mayer, and Ms. Thomas each testified regarding the shooting. Marcus said that Mr. Mayer approached them, stated that they "need to hurry up and get away from this area, the block," and then left the yard. Marcus stated that "[m]oments later," he said he heard two gunshots and saw Mr. Mayer "coming to the cut where we were." Marcus, Mr. Mayer, and the others "hit the ground," and Marcus testified that he heard "two oh, oh's," that sounded "close by" followed by additional gunshots. Mr. Mayer did not testify regarding his conversation with the group while in Mr. Roberts's backyard. Mr. Mayer stated that after leaving the group, he saw the victim talking to someone inside a gold truck. Mr. Mayer said that as he was riding his bicycle, he heard a gunshot and fled to Mr. Roberts's backyard. He did not know the total number of gunshots fired, explaining that he fled after hearing the first gunshot. Ms. Thomas testified to hearing gunshots while in Mr. Roberts's backyard but acknowledged that she did not see the shooting.

Shortly after the shooting, Defendant drove up to Marcus, Travis, Mr. Mayer, Ms. Thomas, and Ms. Dempsey as they were standing in Mr. Roberts's front yard and told them that they needed to get in the vehicle and get away from the area. Mr. Mayer sat in the front passenger seat, and the rest of the group sat in the back seat. Marcus testified that as Defendant turned on South University Street, Defendant instructed the group to not look back and that while Defendant and Mr. Mayer were "exchanging words," Marcus looked behind him and saw "a figure [lying] down on the ground not moving." Likewise, Mr. Mayer testified that as Defendant was driving away from the area, Defendant said someone was lying in the street, and Mr. Mayer recognized the victim as the person lying in the street. Mr. Mayer stated that he looked at Defendant "like, man, what's up," and Defendant "was just giving a little glimpse look. You know, he ain't just saying."

Both Marcus and Mr. Mayer testified that while leaving the scene, Defendant handed money to Mr. Mayer and instructed him to count it. Marcus acknowledged that during the preliminary hearing, he denied seeing Defendant with any money while they left the scene and did not testify that Defendant instructed him against looking back. Marcus explained that during the preliminary hearing, Defendant's counsel caused him to be

---

[4] The trial court found that Mr. Mayer was unavailable at trial, and the State was allowed to play the recording of Mr. Mayer's testimony from Defendant's preliminary hearing to the jury.

"worked up and upset" and that he "just said anything." Marcus stated that he reviewed the transcript of his testimony from the preliminary hearing with the State in preparation for his testimony at trial and that he informed the State that his testimony during the preliminary hearing that he did not see Defendant with money was incorrect.

Defendant drove to the Select Inn located off Church Street and gave Ms. Thomas, the only person in the group with an identification card, cash to rent a room. Marcus, Mr. Mayer, and Ms. Thomas testified that while in the motel room, Defendant admitted to shooting the victim, and he threatened to shoot anyone who reported him to the police. Marcus testified that Defendant said he shot "Byron" but that no one knew who "Byron" was. Once Defendant described "Byron," Marcus concluded that Defendant shot "Byrus," who was Marcus's cousin. Ms. Thomas testified that Defendant said he shot the victim approximately five times, including once in his head. Mr. Mayer testified that Defendant told him that someone named "Mont" paid him to shoot the victim. Mr. Mayer stated that Defendant admitted shooting the victim multiple times, including once in the back and once in the head. According to Mr. Mayer, Defendant stated that he shot the victim once, that the victim said "oh" and fell, and that Defendant continued shooting him. Marcus, Mr. Mayer, and Ms. Thomas never saw Defendant with a gun.

Defendant gave cash to Marcus and Ms. Thomas to purchase cigarettes, beer, and soft drinks at a nearby convenience store. Defendant and Mr. Mayer then left to purchase more drugs. Mr. Mayer testified that he and Defendant went to a Krystal's restaurant where Mr. Mayer called a drug dealer. The dealer instructed Mr. Mayer to tell Defendant that he needed to leave town. Mr. Mayer informed Defendant of the telephone conversation; Defendant gave Mr. Mayer one hundred dollars in cash; Mr. Mayer returned to the neighborhood where he lived; and Defendant returned to the motel room.

Once Defendant returned to the motel room, he gave the group drugs, which they used. Defendant and Marcus then went to Defendant's home and packed Defendant's clothing. Marcus testified that during the drive to Defendant's home, Defendant asked him whether someone who was shot in the head would die. Marcus responded that the person likely would die. Defendant said that "he shot the person twice in the stomach," that "the person turned and ran," that Defendant "shot him in the back," and that "he walked up on the person, put the gun to the head and shot him." Defendant asked whether "that person" would live, and Marcus responded, "I highly doubt it, no." After Defendant and Marcus returned to the motel room, Defendant changed clothes, and the group checked out of the motel and went to Nashville in Defendant's vehicle.

Following the shooting, multiple residents called 911 and reported hearing gunshots and seeing the victim lying in the middle of the street. MPD Officer Johnathon Pope was near the area of the shooting when he heard gunshots. Shortly thereafter, he received

- 4 -

information from dispatch regarding the shooting and proceeded to South University Street. As he was driving to the scene, he saw a black four-door sedan leaving the area, and at trial, he identified a photograph of Defendant's vehicle as matching the description of the vehicle that he saw leaving the area.

MPD Officer Travis Henderson arrived at the scene shortly after Officer Pope, and the officers attempted to render aid to the victim. Officer Henderson observed that the victim's face was "disfigured." The victim had bullet wounds in both temples, and both of his arms were broken. The victim was "mumbling," but the officers could not understand what he was saying. The victim was transported by ambulance to Vanderbilt University Medical Center. Officer Henderson rode in the ambulance with the victim and attempted to question him. Officer Henderson asked the victim his name, and the victim took deep breaths and identified himself as Byrus Hughes. Officer Henderson had previous experience with the victim but did not believe he had ever arrested the victim. The victim continued mumbling, but Officer Henderson only understood him to say, "they shot me."

The victim remained hospitalized for several months and then received hospice care at his mother's home. The victim required constant care, had slurred speech, was unable to walk without assistance, and recognized family members only on occasion. He died on November 2, 2018.

Dr. Emily Dennison, a forensic pathologist, was present during the victim's autopsy, which was conducted by Dr. Miguel Laboy. Dr. Dennison testified that the autopsy report reflected that the victim had a large abdominal scar due to the multiple abdominal surgeries that were required as a result of the gunshot wounds. The victim sustained multiple skull fractures due to a gunshot wound to his head, and the bullet passed through his brain. The victim suffered multiple seizures due to the damage to his brain and skull and ultimately passed away following a seizure. Dr. Dennison testified that the cause of the victim's death was complications from multiple gunshot wounds and that the manner of his death was homicide.

MPD officers had multiple video cameras or "covert surveillance packages" in the area where the shooting occurred that the officers utilized in criminal investigations. One video camera faced Reid Avenue; a second video camera showed South University Street; and both video cameras showed the intersection of Reid Avenue and South University Street. Officers obtained the video recordings from these cameras from around the time of the shooting and surveillance footage from Select Inn. The State introduced these video recordings at trial and had witnesses identify themselves and others in the recordings.

These video recordings reflect that on May 3, 2018, at approximately 4:42 a.m., a dark-colored, four-door sedan with a white driver's side mirror passed by a camera at

nearby Patterson Park. Approximately one minute later, a vehicle, which Marcus identified at trial as belonging to Defendant, parked on the side of the road at Reid Avenue. Marcus and Ms. Thomas identified Marcus and Defendant as they exited the vehicle and walked across the street. Shortly thereafter, one individual, who Marcus identified as himself, walked back across the street and toward the vehicle, followed by another individual, who Marcus identified as Defendant. Marcus identified Defendant as he walked across the street and returned to the house, the rest of the group as they exited the vehicle and walked through the "cut" toward Mr. Roberts's yard, and Mr. Mayer as he followed them on his bicycle. The recording reflected that at approximately 4:54:56 a.m., an individual, who Marcus identified as Defendant, walked away from the house and up the street toward South University Street. At 4:55:25 a.m., the individual turned on South University Street and walked out of the view of the camera.

A recording of the video camera facing South University Street and showing the intersection of South University Street and Reid Avenue reflected an individual, later identified as the victim, walking south on South University Street at approximately 4:53:51 a.m. At approximately 4:54:46 a.m., a second individual, the shooter, appears in the recording walking onto South University Street from Reid Avenue. The recording depicted the shooter and the victim walking toward each other, the victim moving quickly away from the shooter, the victim falling onto the street, the shooter briefly leaning over the victim, and the shooter walking away as the victim remained lying in the street. Detective Kenneth Collins, who retrieved the recordings, noted "flashes" during the confrontation, which he stated were from gunshots. At approximately 4:55:01 a.m., the shooter proceeded back down Reid Avenue and went out of the view of the camera by 4:55:04 a.m. Officers later collected seven nine-millimeter Luger shell casings from the area of the shooting.

The recording from the video camera facing Reid Avenue showed an individual, who Marcus identified as Defendant, walking down South University Street, turning on Reid Avenue and approaching the area of the house at approximately 4:56 a.m. Marcus also identified Defendant as he returned to his vehicle and drove away between 4:56 and 4:57 a.m. The camera facing Reid Avenue showed Defendant's vehicle going down Reid Avenue in the opposite direction of South University Street at approximately 4:57:11 a.m., while the camera facing South University Street showed Defendant's vehicle turning onto South University Street from another intersection and proceeding away from the area of the shooting at 4:57:15 a.m.

Marcus acknowledged that due to the poor quality of the recordings, he could not positively identify Defendant in the recordings. Marcus noted that actions by taken those depicted in the recordings were consistent with the events that occurred around the time of the shooting, and he testified that the recording of the shooting was consistent with Defendant's statements to him regarding how the shooting occurred.

Marcus identified Defendant at trial, but Ms. Thomas was unable to identify him. The State presented evidence without objection from Defendant that Ms. Thomas identified Defendant at the preliminary hearing. The State also presented evidence that Defendant was thinner by the time of trial and was wearing a face mask in accordance with our supreme court's COVID-19 protocol that was in place at the time of trial.

Multiple video cameras recorded Defendant's dark-colored sedan with a white driver's side mirror leaving the area shortly after the shooting occurred. Surveillance footage from Select Inn showed Defendant's vehicle entering the parking lot at 5:07 a.m., Ms. Thomas renting a room, and Defendant, Marcus, Travis, Mr. Mayer, Ms. Thomas, and Ms. Dempsey entering a motel room. Surveillance footage showed different members of the group exiting and entering the motel room throughout the morning. At approximately 11:12 a.m., the group exited the motel room and left in Defendant's vehicle.

On May 8, 2018, Detective Abbott received information that Defendant had returned to Murfreesboro. Sergeant Tommy Massey advised that he believed he was behind Defendant's vehicle and that he planned to conduct a traffic stop. Detective Abbott positioned his vehicle in the roadway to block Defendant, and both Detective Abbott and Sergeant Massey activated their vehicle's emergency lights. Defendant drove around Detective Abbott's vehicle at a high rate of speed and through several stop signs before crashing his vehicle into a vehicle with a woman and her child inside. Sergeant Massey detained Defendant as he was attempting to exit his vehicle and flee.

Detective Abbott and Sergeant Massey interviewed Defendant on May 9, 2018, and a recording of the interview was played for the jury. During the interview, Defendant denied shooting the victim or telling anyone that he shot the victim. Defendant maintained that he was in the area to purchase drugs and acknowledged that he was propositioned to commit the shooting. He initially identified Mr. Mayer as the shooter and later implicated "Twin" in the shooting.

At the conclusion of the proof, the jury returned a verdict convicting Defendant of first degree premeditated murder. During the second phase of the trial, the State sought a conviction for the charge of possession of a firearm by a convicted violent felon. The State presented a certified judgment of Defendant's 1997 conviction for aggravated assault, and the parties stipulated that aggravated assault is a violent felony offense. The jury subsequently returned a verdict convicting Defendant of possession of a firearm by a convicted violent felon.

The trial court sentenced Defendant to a term of life imprisonment for first degree premeditated murder. Following a sentencing hearing, the trial court sentenced Defendant

to a term of seventeen years and six months as a Range II multiple offender for possessing a firearm after a conviction for a violent felony to be served consecutively to his sentence of life imprisonment. On the State's motion, the trial court entered an order of nolle prosequi for Defendant's remaining charges of employment of a firearm during the commission of a dangerous felony, evading arrest, reckless endangerment, and employment of a firearm during the commission of a dangerous felony after having previously been convicted of a dangerous felony.

Defendant filed a joint motion for judgment of acquittal and motion for new trial, as well as multiple amendments both pro se and through counsel. The trial court denied Defendant's motions, and Defendant now timely appeals.

## II. Analysis

On appeal, Defendant argues: (1) that the evidence was insufficient to support his convictions; (2) that the trial court erred in issuing a flight instruction; and (3) that the trial court committed plain error when polling the jury.

## A. Sufficiency of the Evidence

Defendant asserts that the trial court erred in denying his motion for judgment of acquittal because the evidence was insufficient to support his convictions. In challenging his conviction for first degree premeditated murder, he asserts that the evidence was insufficient to establish his identity as the shooter and that the evidence failed to sufficiently corroborate his confessions. Defendant also argues that "because the subsequent charge of possession of a weapon by a felon is predic[a]ted upon [Defendant's] conviction of [f]irst [d]egree [m]urder, that indictment should be dismissed as well." The State responds that Defendant waived his challenge to the firearm conviction by failing to cite to the record or any authority to support his claim and that, regardless, the evidence presented at trial was sufficient to support both of Defendant's convictions. We agree with the State.

"The standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction[.]" *State v. Thompson*, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000). The standard of review for a claim challenging the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see also State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011); Tenn. R. App. P. 13(e).

"This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

A guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal; therefore, the burden is shifted to the defendant to prove why the evidence is insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)). On appeal, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Id.* at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual disputes raised by such evidence, are resolved by the jury as the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 405, 410 (Tenn. 1990). Therefore, we are precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017), *abrogated on other grounds as recognized in State v. Beaty*, No. M2016-00130-CCA-R3-CD, 2016 WL 3752968, at *20 (Tenn. Crim. App. July 8, 2018), *perm. app. denied* (Tenn. Jan. 10, 2017).

Under Tennessee Code Annotated section 39-13-202(a)(1), first degree murder is the "premeditated and intentional killing of another[.]" Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." *Id.* § 39-13-202(e).

Whether premeditation exists is a question of fact for the jury "which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *see also State v. Reynolds*, 635 S.W.3d 893, 916 (Tenn. 2021). The Tennessee Supreme Court has identified a non-exhaustive list of specific circumstances that suggest the existence of premeditation:

(1) The use of a deadly weapon on an unarmed victim;
(2) The particular cruelty of the killing;
(3) Threats or declarations of the intent to kill;
(4) The procurement of a weapon;
(5) Any preparations to conceal the crime undertaken before the crime was committed;
(6) The destruction or secretion of evidence of the killing;
(7) Calmness after the killing;
(8) Evidence of motive;

- 9 -

(9) The use of multiple weapons in succession;

(10) The infliction of multiple wounds or repeated blows;

(11) Evidence that the victim was retreating or attempting to escape when killed;

(12) The lack of provocation on the part of the victim; and

(13) The failure to render aid to the victim.

*Reynolds*, 635 S.W.3d at 916-17 (first citing *State v. Clayton*, 535 S.W.3d 829, 845 (Tenn. 2017); then citing *State v. Dickson*, 413 S.W.3d 735, 746 (Tenn. 2013); then citing *State v. Kiser*, 284 S.W.3d 227, 268-69 (Tenn. 2009); then citing *State v. Leach*, 148 S.W.3d 42, 53-54 (Tenn. 2004); and then citing *Bland*, 958 S.W.2d at 660).

## 1. Identity of the Shooter

The identity of the perpetrator "is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006), *abrogated on other grounds by State v. Miller*, 638 S.W.3d 136 (Tenn. 2021). Identity "may be established solely on the basis of circumstantial evidence." *State v. Lewter*, 313 S.W.3d 745, 748 (Tenn. 2010). "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing *State v. Strickland*, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)). The issue of identity is a question of fact left to the jury as the trier of fact to resolve. *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

When viewed in the light most favorable to the State, the evidence presented at trial established that Defendant drove a group of people to the area shortly before the shooting to purchase drugs, and Marcus had to give Defendant money to do so. After Marcus and Defendant purchased drugs from different dealers inside the same house, Defendant told the rest of the group that they needed to leave because he had something that he needed to do. Defendant returned to the house while the rest of the group walked to a nearby backyard and smoked crack cocaine. Marcus testified that Mr. Mayer approached the group in the backyard and warned them to leave the area. Marcus testified to hearing multiple gunshots shortly thereafter, and Mr. Mayer was with the group while some of the shots were fired.

After the shooting, Defendant drove up to the group in his vehicle and told them that they needed to get in the vehicle and leave the area. Marcus testified that while Defendant was passing through the scene of the shooting, he told the group not to look back, and Marcus looked behind him and saw someone lying on the roadway and not moving. Mr. Mayer recognized the victim lying in the roadway and testified that he looked

over in a questioning manner at Defendant, who "was just giving a little glimpse look." Defendant subsequently made multiple statements in which he admitted to shooting the victim. His statements regarding how the shooting occurred were consistent with the wounds sustained by the victim and the video recording of the shooting. Defendant threatened to kill the others in the group if they reported him to police.

Defendant told Mr. Mayer that "Mont" paid him to shoot the victim, and while fleeing the scene, Defendant handed money to Mr. Mayer and instructed him to count it. Although Marcus had to give twenty dollars to Defendant to purchase drugs prior to the shooting, Defendant had sufficient funds following the shooting to pay for a motel room, beer, cigarettes, and other items for the group. Defendant subsequently packed his clothes and fled to Nashville. When police officers tried to stop Defendant's vehicle a few days later, he drove away at a high rate of speed and crashed into another vehicle. During an interview with police officers, Defendant denied shooting the victim but admitted that he was propositioned to do so.

Defendant argues that the State did not establish his identity through Ms. Thomas's testimony because Ms. Thomas was unable to identify him at trial. However, Ms. Thomas identified Defendant in the surveillance video from Select Inn, described the events and conduct of Defendant, who she referred to as "Tony," and previously identified Defendant at the preliminary hearing. Defendant asserts that the trial court erred in admitting evidence of Ms. Thomas's identification of him at the preliminary hearing and maintains that the State failed to meet the requirements of the hearsay exception for a prior identification pursuant to Tennessee Rule of Evidence 803(1.1). Defendant, however, has waived this argument by failing to object to the admission of the evidence at trial. *See* Tenn. R. App. P. 36(a) ("Nothing in [Rule 36] shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008) ("The failure to make a contemporaneous objection constitutes a waiver of the issue on appeal."). Furthermore, "regardless of the propriety of the admission of the challenged evidence, the sufficiency of the convicting evidence must be examined in light of all the evidence presented to the jury, including that which may have been improperly admitted." *Gilley*, 297 S.W.3d at 763 (citing *State v. Longstreet*, 619 S.W.2d 97, 100-01 (Tenn. 1981)). Viewing Ms. Thomas's testimony in its entirety, a jury could reasonably conclude that Defendant was the person about whom Ms. Thomas was testifying and implicating in the offense.

Defendant urges this court to apply the "cancellation rule" and to "disregard" Marcus's testimony regarding Defendant's having money following the shooting and his admitting to shooting the victim because Marcus gave contradictory statements during the preliminary hearing. Under the cancellation rule, "contradictory [sworn] statements made

by a witness as to the same fact can cancel each other out." *State v. Caldwell*, 977 S.W.2d 110, 118 (Tenn. Crim. App. 1997) (citing *Taylor v. Nashville Banner Publ'g Co.*, 573 S.W.2d 476, 482 (Tenn. Ct. App. 1978)). When proof of a fact "lies wholly with one witness," who both affirms and denies the fact, there is no "evidence at all to prove the fact." *State v. Matthews*, 888 S.W.2d 446, 449-50 (Tenn. Crim. App. 1993) (quoting *Johnston v. Cincinnati N.O. & T.P. Ry. Co.*, 240 S.W. 429, 436 (Tenn. 1922)). The cancellation rule applies "only when inconsistency in a witness's testimony is unexplained and when neither version of his testimony is corroborated by other evidence." *Caldwell*, 977 S.W.2d at 118.

At trial, Marcus acknowledged that during the preliminary hearing, he did not testify that Defendant instructed him not to look back while Defendant was driving away from the scene. Marcus also acknowledged that during the preliminary hearing, he denied seeing Defendant with any money as Defendant drove away from the scene. Marcus explained that his inconsistent testimony was the result of his frustration with Defendant's counsel at the preliminary hearing. Furthermore, Marcus's trial testimony was corroborated by Mr. Mayer's testimony that Defendant mentioned someone lying in the roadway and that Defendant handed money to Mr. Mayer to count as they were leaving the scene, as well as evidence that Defendant had money to pay for a motel room, cigarettes, beer, and other items following the shooting. Accordingly, the cancellation rule does not apply to Marcus's trial testimony.

Defendant further argues that the video recordings reflect that the shooting began on South University Street at 4:54 a.m., but that he did not leave the house on Reid Avenue and begin walking toward South University Street until 4:55 a.m. He maintains that, as a result, the recordings do not establish his identity as the shooter. However, additional discrepancies between the two recordings indicate that the times in the two video cameras were not in sync. For example, although the recording from South University Street showed the shooter's walking to the intersection and back down Reid Avenue at approximately 4:55 a.m. following the shooting, no one appeared in the same area in the recording from Reid Avenue until approximately 4:56 a.m. Upon reviewing the recordings, a reasonable jury could have rejected Defendant's claim that the recordings did not establish that he was the shooter but, instead, could have concluded that the times on the video cameras were not in sync, resulting in the discrepancy of approximately one minute.

Finally, Defendant asserts that the witnesses gave conflicting testimony, and he challenges the credibility of the witnesses and the weight to be given to their testimony. In examining the sufficiency of the evidence, we may not reweigh or reevaluate the evidence, and we may not substitute our inferences for those drawn from the evidence by the jury as the trier of fact. *See State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002); *Bland*, 958 S.W.2d

at 659. Rather, the jury's verdict resolved any such conflicts in the favor of the State. *See id.* We conclude that the evidence presented at trial, including Defendant's presence at the scene both before and after the shooting; his admissions to being the shooter; his description to others of how the shooting occurred, which was consistent with the victim's wounds and the recording of the shooting; his possession of money after the shooting; his flight from the scene; and his efforts to elude police, is sufficient to establish Defendant's identity as the shooter.

## 2. Corroboration of Defendant's Confessions

Defendant challenges the sufficiency of the evidence supporting his first degree premeditated murder conviction based on "the long-established common-law rule that a person cannot be convicted of a crime solely on the basis of an uncorroborated extrajudicial confession." *State v. Frausto*, 463 S.W.3d 469, 479-80 (Tenn. 2015) (citing *State v. Bishop*, 431 S.W.3d 22, 61 (Tenn. 2014)). Defendant, however, relies upon the traditional *corpus delicti* rule that our supreme court abandoned in favor of the "modified trustworthiness standard" more than ten years ago in *State v. Bishop*, 431 S.W.3d 22, 58 (Tenn. 2014). We conclude that even under the "modified trustworthiness standard," Defendant is not entitled to relief.

Under the "modified trustworthiness standard,"

[w]hen a defendant challenges the admission of his extrajudicial confession on lack-of-corroboration grounds, the trial court should begin by asking whether the charged offense is one that involves a tangible injury. If the answer is yes, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, plus independent prima facie evidence that the injury actually occurred. If the answer is no, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, and the evidence must link the defendant to the crime.

*Bishop*, 431 S.W.3d at 59. (internal footnotes and citations omitted). "Prima facie" evidence is defined as "'[e]vidence that will establish a fact or sustain a judgment unless contradictory evidence is produced.'" *State v. Clark*, 452 S.W.3d 268, 280 (Tenn. 2014) (quoting Black's Law Dictionary 638-39 (9th ed. 2009)). "Substantial evidence" is defined as "'[e]vidence that a reasonable mind could accept as adequate to support a conclusion; evidence beyond a scintilla.'" *Id.* (quoting Black's Law Dictionary 640 (9th ed. 2009)).

Regardless of whether the charged offense involved a tangible injury, the State must present "substantial independent evidence" that the defendant's confession is trustworthy.

- 13 -

*Bishop*, 431 S.W.3d at 59. "To establish trustworthiness, the State's independent evidence must corroborate essential facts contained in the defendant's statement." *Id.* This independent corroborating evidence need not, alone, prove the offense beyond a reasonable doubt or by a preponderance of the evidence and need not prove each element of the charged offense. *Id.* at 59 n.33 (citing *Smith v. United States*, 348 U.S. 147, 156 (1954)). Rather, "[t]he aim of the corroborating evidence is merely 'to ensure the reliability of the confession or admission of the accused.'" *Id.* (quoting *United States v. Trombley*, 733 F.2d 35, 37 (6th Cir. 1984)).

Independent evidence corroborating any "collateral circumstances surrounding the confession" is not sufficient to establish trustworthiness. *Id.* at 60. A defendant's additional extrajudicial confessions also are insufficient by themselves to establish trustworthiness. *Id.* at 61. A statement made under oath in open court does not require independent corroboration, and an "infrajudicial statement" may corroborate an extrajudicial statement. *Id.*

The State can bolster the trustworthiness of a defendant's extrajudicial confession by presenting "independent evidence that 'parallel[s] the defendant's confession' or corroborates the defendant's account of what happened immediately before or after the crime." *Id.* at 60 (citations omitted). The State also can bolster a defendant's extrajudicial confession by "presenting evidence showing that the defendant's statement reveals 'specific personal knowledge about the crime.'" *Id.* (quoting *State v. Mauchley*, 67 P.3d at 477, 489 (Utah 2003)). Our supreme court has explained that such personal knowledge may take the form of:

> (1) information provided by the defendant that leads to the discovery of evidence unknown to the police, (2) information about "highly unusual elements of the crime that have not been made public," or (3) information providing "an accurate description of the mundane details of the crime scene which are not easily guessed and have not been reported publicly" and which are not "the result of suggestion by the police."

*Id.* (quoting *Mauchley*, 67 P.3d at 489).

"[O]nce the State presents independent evidence establishing the prima facie trustworthiness of the defendant's extrajudicial confession, the existence of contradictory evidence does not necessarily render the confession untrustworthy." *Id.* at 61. Rather, the existence of contradictory evidence raises an issue of credibility that is to be resolved by the factfinder. *Id.* (citing *State v. Reddish*, 859 A.2d 1173, 1212 (N.J. 2004)). "The question of whether an extrajudicial confession is adequately corroborated is a mixed question of law and fact that appellate courts will review do novo." *Id.*

- 14 -

The instant case involves first degree murder, a crime with a tangible injury. *See id.* at 62. The identity of the victim and the fact that he died from injuries sustained during the shooting are undisputed. We also conclude that the State established the trustworthiness of Defendant's extrajudicial confessions by providing substantial independent evidence corroborating the facts included in Defendant's statements.

Marcus testified that while in the motel room, Defendant admitted to shooting the victim approximately five times, including once in the head. Defendant later told Marcus that he shot the victim twice in the stomach, that the victim turned and ran, that Defendant shot the victim in the back, and that Defendant then walked up to the victim and shot him in the head. Mr. Mayer testified that while in the motel room, Defendant admitted shooting the victim multiple times, including once in the back and once in the head. According to Mr. Mayer, Defendant stated that he shot the victim once, that the victim said "oh" and fell, and that Defendant continued shooting the victim. Mr. Mayer also testified that Defendant stated that "Mont" paid him to shoot the victim.

Defendant's statements were consistent with the video recording of the shooting and the results of the victim's autopsy. Marcus testified that he heard two gunshots and "two oh, oh's," followed by additional gunshots. The results of the victim's autopsy reflected that the victim sustained multiple gunshot wounds, including wounds to his head and abdomen, and officers recovered seven nine-millimeter shell casings from the scene. Multiple witnesses placed Defendant at the scene immediately before and after the shooting, and Defendant fled the scene following the shooting and attempted to elude capture by authorities. Although Marcus had to give money to Defendant prior to the shooting to purchase drugs, multiple witnesses testified to seeing Defendant with money following the shooting, and Defendant was able to pay for a motel room, cigarettes, beer, and other items for the group. Although Defendant challenges the credibility of the witnesses who testified at trial, "credibility was a determination for the jury and did not impact the trustworthiness of the confession." *State v. Warner*, No. M2016-02075-CCA-R3-CD, 2018 WL 2129509, at *13 (Tenn. Crim. App. May 9, 2018), *no perm. app. filed*.

We conclude that Defendant's confessions met the "modified trustworthiness standard" set forth in *Bishop*. Based on Defendant's confessions and the evidence corroborating those confessions, a rational jury could have found Defendant guilty beyond a reasonable doubt for first degree premeditated murder. Accordingly, the evidence is sufficient to support Defendant's murder conviction, and he is not entitled to relief on this issue.

### 3. Firearm Conviction

In challenging his conviction for possession of a firearm by a convicted violent felon, Defendant makes a one-sentence argument in his brief that "because the subsequent charge of possession of a weapon by a felon is predic[a]ted upon [Defendant's] conviction of [f]irst [d]egree [m]urder, that indictment should be dismissed as well." Defendant, however, has waived this issue on appeal by failing to support his claim with argument and citation to authorities. *See* Tenn. R. App. P. 27(a)(7)(A) (requiring an appellant to support issues raised on appeal with "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record"); Tenn. Ct. Crim. App. R. 10(b) (proving that issues raised by an appellant that "are not support by argument, citation to authorities, or appropriate references to the record will be treated as waived"); *State v. Johnson*, No. E2021-01106-CCA-R3-CD, 2023 WL 3535344, at *7 (Tenn. Crim. App. May 18, 2023) (A defendant who "briefly mentions the issue and does not support his claim with argument, citation to relevant legal authority, or references to the record" waives that issue.), *no perm. app filed*.

Regardless, from our independent review of the record, when we view the evidence in the light most favorable to the State, we conclude that the evidence was sufficient to sustain Defendant's convictions for possession of a weapon by a violent felon. Tennessee Code Annotated section 39-17-1307(b)(1)(A) (Supp. 2017) prohibits a person from unlawfully possessing a firearm after having been convicted of a "felony crime of violence." Aggravated assault is a felony crime of violence. Tenn. Code Ann. § 39-17-1301(3) (Supp. 2017). The evidence presented at trial established that Defendant used a firearm to shoot the victim and that Defendant had a prior aggravated assault conviction, which is a felony crime of violence. Accordingly, Defendant is not entitled to relief on this issue.

## B. Flight Instruction

Defendant contends that the evidence was insufficient to support an instruction on flight and that the trial court, therefore, erred in issuing the instruction to the jury. The State responds that the trial court correctly instructed the jury. We agree with the State.

At trial, the State requested that the trial court issue a flight instruction and argued that the instruction was warranted based on evidence that Defendant left the scene of the shooting, rented a motel room, went to his home to retrieve clothing, changed clothes, went to Nashville, and fled from police officers several days later when they tried stopping him. Defendant objected, arguing that the evidence did not support the issuance of a flight instruction. The trial court agreed with the State and instructed the jury that:

The flight of a person accused of a crime is a circumstance which, when considered with all the facts of the case, may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the defendant fled is a question for your determination.

The law makes no precise distinction as to the manner or method of flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all of the other evidence when you decide the guilt or innocence of the defendant. On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered, or by the facts and circumstances of the case.

Whether there was flight by the defendant, the reasons for it, and the weight to be given to it, are questions for you to determine.

The sufficiency of a trial court's jury instructions "is a question of law appellate courts review de novo with no presumption of correctness." *Clark*, 452 S.W.3d at 295. "It is well-settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *Dorantes*, 331 S.W.3d at 390. "As part of their instructions in criminal cases, trial courts must describe and define each element of the offense or offenses charged." *Clark*, 452 S.W.3d at 295. "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005).

"In order for a trial court to charge the jury on flight as an inference of guilt, there must be sufficient evidence to support such instruction." *State v. Berry*, 141 S.W.3d 549, 588 (Tenn. 2004) (appendix). The evidence is sufficient to support a flight instruction where there is proof of "'both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts

- 17 -

unknown.'" *State v. Burns*, 979 S.W.2d 276, 289-90 (Tenn. 1998) (emphasis omitted) (quoting *State v. Payton*, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989)). "'The law makes no nice or refined distinction as to the manner or method of a flight; it may be open, or it may be a hurried or concealed departure, or it may be concealment within the jurisdiction.'" *Irick v. State*, 973 S.W.2d 643, 654 (Tenn. Crim. App. 1998) (quoting *Rogers v. State*, 455 S.W.2d 182, 186 (Tenn. Crim. App. 1970)). "A flight instruction is not prohibited when there are multiple motives for flight," and "[a] defendant's specific intent for fleeing a scene is a jury question." *Berry*, 141 S.W.3d at 589. "Evidence of flight to avoid arrest may be rebutted by a credible explanation of some motive other than guilt, but the conclusion to be drawn from such evidence is for the jury upon proper instructions from the trial court." *Hall v. State*, 584 S.W.2d 819, 821 (Tenn. Crim. App. 1979).

We agree with the trial court that the evidence presented at trial fairly raised the issue of flight. Proof was presented that following the shooting, Defendant drove away from the scene, stopped for the others in the group, and told them that they needed to get away from the area. Defendant went to a motel, briefly stopped by his home to retrieve his clothing, changed clothes upon returning to the motel, and went to Nashville. When officers initiated a traffic stop several days later, Defendant fled at a high rate of speed before crashing into another vehicle. Officers detained Defendant as he was attempting to exit his vehicle and flee. From this evidence, the jury could infer that Defendant left the scene of the shooting and subsequently hid out, evaded, or concealed himself within or outside the community. Thus, sufficient evidence existed to support the instruction.

## C. Polling the Jury

Defendant asserts that the trial court committed plain error in failing to properly poll the jury to ensure that the verdict finding him guilty of first degree premeditated murder was unanimous.[5] He specifically argues that "[i]t does not appear that Juror Number 9 was ever polled and remained mute throughout the polling of the jury." The State responds that the record establishes that each juror was polled individually and confirmed the verdict.

In Tennessee, a criminal defendant has a constitutional right to a jury trial when facing the possibility of confinement or a fine of more than fifty dollars. *See* Tenn. Const. art. I, § 9; *State v. Lemacks*, 996 S.W.2d 166, 169 (Tenn. 1999). "This constitutional right necessarily includes the right to a unanimous jury verdict before a conviction of a criminal offense may be imposed." *Id.* at 169-70. A criminal defendant has the statutory right to have the jury polled upon request. Tennessee Code Annotated section 20-9-508 provides that trial judges "shall be required to poll the jury on application of either the state or the

---

[5] The trial court bifurcated Defendant's murder count from his felon in possession count, and Defendant challenges the court's polling of the jurors only as to the murder count.

defendant in criminal cases and either the plaintiff or the defendant in civil cases, without exception." Tennessee Rule of Criminal Procedure 31(e), likewise, provides:

> After a verdict is returned but before the verdict is recorded, the court shall--on a party's request or on the court's own initiative--poll the jurors individually. If the poll indicates that there is no unanimous concurrence in the verdict, the court may discharge the jury or direct the jury to retire for further deliberations.

The method used to poll the jury is left to the discretion of the trial court. *State v. Clayton*, 131 S.W.3d 475, 479 (Tenn. Crim. App. 2003).

Defendant did not request that the jury be polled or object to the trial court's method of polling the jury. Thus, Defendant has waived this issue for purposes of appeal. *See State v. Banks*, 271 S.W.3d 90, 123-24 (Tenn. 2008); *State v. Stephens*, 264 S.W.3d 719, 737 (Tenn. Crim. App. 2007). Defendant, however, requests that this court review the issue for plain error.

"When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). Five factors must be met before this court will conclude that plain error exists:

> "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted)). All five factors must be established before this court will recognize plain error and "'complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established.'" *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016) (quoting *Smith*, 24 S.W.3d at 283). "'When asserting plain error, the defendant bears the burden of persuading the appellate court that the trial court committed plain error and that the error was of sufficient magnitude that it probably changed the outcome of the trial.'" *Id*. at 505 (quoting *State v. Smith*, 492 S.W.3d 224, 232 (Tenn. 2016)).

The record reflects that after the jury announced its verdict finding Defendant guilty of first degree premeditated murder, the trial court questioned each juror to confirm that

the juror agreed with the verdict. While there did appear to be a misunderstanding between the court and Jurors 9 through 12 as to their individual juror numbers, the record is clear that the court affirmed the verdict with all twelve jurors, who are listed by name in the transcript.[6] This process ensured that each juror affirmed the verdict and that each juror affirmed the verdict of guilt for first degree premeditated murder. Consequently, Defendant has failed to establish the breach of a clear and unequivocal rule of law and, therefore, has failed to establish plain error. *Smith*, 24 S.W.3d at 282. Defendant is not entitled to relief on this issue.

## III. Conclusion

The record reflects that on the State's motion, the trial court entered an order of nolle prosequi for Defendant's charges of employment of a firearm during the commission of a dangerous felony, evading arrest, reckless endangerment, and employment of a firearm during the commission of a dangerous felony after having previously been convicted of a dangerous felony in Counts 2, 4, 5, and 6 of the indictment. However, the record does not include judgments reflecting the dismissal of the counts. Therefore, we remand for entry of judgments reflecting the dismissal of Counts 2, 4, 5, and 6 of the indictment. We otherwise affirm the judgments of the trial court.

_____
MATTHEW J. WILSON, JUDGE

---

[6] Out of respect for the privacy of the jurors and their civic service, we will not list their respective names in this opinion.